# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| | : |
| PSC INFO GROUP, | : CIVIL ACTION |
|     Plaintiff, | : |
| | : No. 08-2176 |
|         v. | : |
| | : |
| LASON, INC., *et al.*, | : |
|     Defendants. | : |
| | : |
| | : |

## MEMORANDUM

YOHN, J.                                                       February 3, 2010

       Plaintiff, PSC Info Group ("PSC"), brings this action against defendants Bay Area Credit

Services ("BACS"), HOV Services, Ltd. ("HOV"), and Lason, Inc. ("Lason"), for breach of

contract and tortious interference with contractual relations. Defendants have collectively moved

pursuant to Fed. R. Civ. P. 56(b) for summary judgment on all claims. Defendants argue that:

(1) PSC's breach of contract claims against BACS are time-barred under the six-month

limitations period stated in the contract between PSC and BACS; (2) HOV is not liable for

breach of contract because PSC has failed to produce any evidence of the requisite criteria for

piercing the corporate veil; (3) HOV's interference with the contract was privileged as a result of

its parent/subsidiary relationship with BACS; and (4) Lason cannot be held liable for tortious

interference because it was unaware of the contract between PSC and BACS.[1] I will grant

summary judgment on all claims except for (1) that portion of PSC's breach of contract claim

---

      [1] PSC's breach of contract claim against Lason was previously dismissed. *See PSC Info Group v. Lason, Inc.*, No. 08-2176, 2008 WL 4660943, at *8 (E.D. Pa. Oct. 21, 2008).

against BACS that reflects breaches between November 10, 2007, and May 31, 2008; and

(2) PSC's tortious interference claim against HOV.

## I. Factual Background

PSC is a document processing company that contracts with other businesses to print, sort, and mail debt collection notices. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss[2] ("Pl.'s Mem.") 1.) On May 31, 2006, PSC entered into a written one-year contract with BACS, a debt collection firm affiliated with HOV,[3] to process, print, and mail BACS' collection letters. (Pl.'s Reply in Opp'n to Defs.' Mot. Summ. J. ("Pl.'s Reply") Ex. I; Defs.' Mot. Summ. J. ("Defs.' Mot.") Ex. E ("PSC Contract").) Under the terms of this contract, PSC was to create standard templates for BACS' regular mailings. (PSC Contract ¶ I(a).) BACS would then send data files to PSC containing information that PSC would place into the templates, creating individual letters to be sent. (Id. ¶ I.) PSC would then mail these letters to their intended recipients. (Id. ¶ I(e).) The contract also stated that PSC was to be the "exclusive agent for the purposes described" in the contract. (Id. ¶ I.)

According to the contract, the monthly volume to be processed and mailed was "projected initially to be 400,000 [units] per month." (Id. ¶ V.) PSC would charge BACS a per-unit rate that was to vary according to the volume that BACS sent each month. (Id. ¶ V; Pl.'s Reply Ex. I, at

---

[2] Despite its title, this memorandum was filed in opposition to defendants' motion for summary judgment.

[3] The exact nature of the relationship between BACS and HOV is unclear. According to defendants, BACS is owned by HOV, LLC, a wholly owned subsidiary of defendant, HOV, Ltd. (*See* Defs.' Statement 4; Cogburn Dep. 49-50; Negi Dep. 24.) PSC agrees with defendants on this issue early on in its memorandum of law (*see* Pl.'s Mem. 3), but takes the contrary position later in that same memorandum (*see id.* at 10-11) and in its response to defendants' statement of undisputed facts (*see* Pl.'s Resp. to Defs.' Statement of Undisputed Facts ("Pl.'s Resp.") ¶ 2; Cogburn Dep. 52, 54-55). For the purposes of this opinion, I will assume the truth of the position most favorable to PSC within the context of each argument.

3.) If BACS failed to reach the projected volume of 400,000 units per month within 120 days of the commencement of processing, PSC reserved the right to prospectively alter the per-unit charge. (PSC Contract ¶ V.) The contract was to be automatically renewed on a year-to-year basis unless either party provided the other with notice of termination. (*Id.* ¶ IV(a).) The contract also contained a provision requiring that any action arising out of the agreement between the parties was to be filed within six months of the accrual of the underlying claim. (*Id.* ¶ XII.)[4]

The contractual relationship between PSC and BACS was marked early on by conflict. According to Jesse Singh, BACS' Vice-President of Information Technologies (Defs.' Statement ¶ 18), BACS sent "letter samples" to PSC in May and June 2006, but PSC failed to format some of those letters in its system and return its own samples for BACS' approval until September or October. (Singh Dep. 109.) Each party blames the other for this delay. (*See id.* at 114-15; Greco Dep.[5] 35-36.) In the meantime, BACS continued to use other document processing suppliers in addition to PSC, despite the exclusivity provision in the contract. (*See* Singh Dep. 117-18.)

There were also disputes over billing practices. Defendants claim that PSC regularly made billing errors in PSC's favor, which PSC would then correct when BACS challenged the invoices. (*See id.* at 141-42.) According to PSC, the initial bills were correct but BACS insisted on applying the "preprinted duplex printing" rate despite the fact that the services PSC performed involved the more expensive "variable duplex printing" method, which was normally billed at a

---

[4] There is also an arbitration clause requiring that all claims, other than claims by PSC for payment for work already performed, were to be submitted to arbitration. (PSC Contract ¶ XIII.) Neither party has moved to compel arbitration of this dispute.

[5] Joseph Greco is the Chief Executive Officer of PSC. (Greco Dep. 8.)

higher rate. (*See* Kaster Dep.[6] 58-62.) In addition, on October 26, 2006, PSC notified BACS that it would raise its per-unit processing rates, effective December 1, 2006, as a result of an increase in the price of raw materials such as paper. (*See* Defs.' Mot. Ex. G.) According to defendants, this rate increase violated the terms of the contract. (*See* Defs.' Mem. 1.) In addition, according to an internal email by a PSC employee, by January 17, 2007, BACS had amassed a large outstanding balance on its account with PSC, of which over $50,000 was more than 31 days past due. (Defs.' Mot. Ex. J.)

After the end of the 120-day contractual "ramp-up" period, BACS continued to send well under 400,000 documents per month to PSC for processing, causing concern among members of PSC management. (*See* Kaster Dep. 67.) In an email dated December 13, 2006, Stephanie Kaster, a PSC employee, told Singh that she was "receiving a lot of concern from [her] senior team and need[ed] some immediate assistance." (Defs.' Mot. Ex. H.) Kaster later testified in a deposition that this portion of the email referred to the continued low volume of work that BACS was sending PSC. (Kaster Dep. 68-69.) The volume of work peaked in January 2007 at 158,884 units and then went into a relatively steady decline. (Defs.' Mot. Ex. P; Greco Dep. 47.)

On around February 26, 2007, either HOV or its wholly-owned subsidiary, HOV, LLC,[7] acquired Lason, a company that also performs document processing and mailing services. (*Compare* Cogburn Dep.[8] 7 ("I believe it was HOV Services Limited [that] acquired Lason")

---

[6] Stephanie Kaster is an employee of PSC who negotiated the contract between PSC and BACS. (*See* PSC Contract.)

[7] In the context of this opinion, where not otherwise specified, "HOV" will refer to defendant, HOV, Ltd.

[8] Ronald Cogburn is the corporate designee of HOV. (Cogburn Dep. 3.) At the time of the Lason acquisition, Cogburn was the president of HOV. (*Id.* at 13-14.)

*with* Reynolds Dep.[9] 8-9 (testifying that Lason was acquired by Rustic Canyon II, which in turn was acquired on approximately the same day by HOV, LLC, a separate company from HOV, Ltd.).)[10] Lason is a competitor of PSC. (Greco Dep. 40-41.)

Following the Lason acquisition, corporate officers of HOV, LLC, and HOV, Ltd., held "integration meetings" in order to determine whether any services that HOV and its subsidiaries had previously bought from outside vendors could be performed more cost-effectively "in-house." (Cogburn Dep. 58-69.)  As a result of the integration analysis, BACS began using Lason for its mailing services sometime before June 30, 2007. (*See* Cogburn Dep. 69; Singh Dep. 45-46; Defs.' Mot. Ex. N (Lason invoices).) None of the defendants explicitly notified PSC of this decision. (Greco Dep. 72, 75.)

PSC management noticed sometime in May 2007 that BACS had failed to meet the projected volume stated in the contract and that its volume of mailings had been "trending down and becoming sort of non-existent." (*Id.* at 34.) That month, Joseph Greco, the CEO of PSC, spoke on the telephone to Singh and asked how the parties could continue their business relationship and whether there were any problems with PSC's service. (Singh Dep. 139-40; Greco Dep. 35-40, 43-46.) Greco also inquired as to why PSC had not become BACS' exclusive

---

[9] James Reynolds was the director of finance of Lason at the time that it was acquired. (Reynolds Dep. 7.) He is now the Chief Financial Officer of HOV, LLC. (*See id.* at 13-14.)

[10] As with respect to the corporate owner of BACS, *see supra* note 2, PSC has taken inconsistent positions on this issue at different points in its opposition to the motion for summary judgment. (*Compare* Pl.'s Mem. 2-3 (arguing that HOV, Ltd. owns Lason) *with id.* at 10 (arguing that Lason was acquired by HOV, LLC).) Defendants contend that Lason was actually acquired by Rustic Canyon II, which in turn was acquired on approximately the same day by HOV, LLC, a wholly owned subsidiary of HOV, Ltd., and the parent of BACS. (Defs.' Statement of Undisputed Facts ("Defs.' Statement") 12; *see* Reynolds Dep. 8-9; Cogburn Dep. 56.)

PSC consistently maintains that, regardless of which HOV entity owns BACS and which one owns Lason, BACS and Lason have different corporate parents. (Pl.'s Mem. 3, 10; Pl.'s Resp. ¶¶ 1-2.)

provider of document processing. (Greco Dep. 39.) According to Greco, Singh spoke about concerns he had with PSC's service and confirmed that BACS had not fully "covert[ed]" from other vendors but did not discuss the Lason merger. (Greco Dep. 39-41; Singh Dep. 140.) Greco testified that Singh's responses "didn't resonate, didn't sort of make sense." (Greco Dep. 35.) As a result, Greco "knew [PSC was] getting played by them [BACS] at that point" and was "convinced that they [BACS] weren't going to live up to the terms of the agreement." (*Id.* at 35, 43.) "[S]hortly thereafter a decision was made to pursue enforcing of the contract." (*Id.* at 40.)

In February 2007 BACS provided PSC with 103,030 pieces of mail to service. In March 2007 the volume decreased to 60, 772. In May 2007 the volume further decreased to 29, 220 pieces of mail. By July, the volume had decreased to 10,515, approximately 10% of the volume in February when Lason was acquired. (*See* Pl.'s Mem. 4; Defs.' Statement ¶ 41.) Defendants concede that BACS altogether stopped sending documents to PSC for processing in July 2007. (*See* Singh Dep. 139; Defs.' Mot. Ex. O.)

On September 5, 2007, Mike Hennessy, the Director of Information Technology for PSC, sent an internal email to Greco and Kaster discussing BACS' cessation of business and noting that BACS had failed since July to respond to PSC's multiple attempts at communication. (Defs.' Mot. Ex. O.) The email speculated that BACS had transitioned to another vendor and raised the possibility of "go[ing] after" BACS based on the contract. (*Id.*) Greco confirmed that the memo meant that, as of September 5, 2007, he had decided to pursue legal remedies against BACS because it was "quite obvious" that they were in breach of the agreement. (Greco Dep. 44.) The undisputed evidence shows that as of September 5, 2007, PSC had not received a single collection letter for processing in over two months from BACS even though PSC believed that the agreement required BACS to deliver at least 400,000 pieces per month. (*See* Pl.'s Mem. 4.)

There is no record of any further communication between the parties between September 2007 and February 15, 2008, when counsel for PSC contacted the president of BACS, informing BACS that it was in default of its "contractual and quasi contractual obligations under Pennsylvania law" as a result of its failure to send 400,000 letters per month for processing to PSC. (*See* Defs.' Mot. Ex. R; Pl.'s Reply Ex. G.) In response, in-house counsel for BACS sent a letter, dated February 26, 2008, to PSC's counsel, contesting PSC's allegations of default and notifying PSC that "BACS intends to terminate the Agreement at the end of this current term" (Defs.' Mot. Ex. S, at 3; Pl.'s Resp. Ex. H, at 4), which was on May 31, 2008 (*see* PSC Contract ¶ IV(b)).

PSC filed suit in this court on May 10, 2008. Count I of PSC's complaint alleged that HOV and Lason tortiously interfered with the contract between PSC and BACS. Count II alleged that BACS breached the contract between PSC and BACS. Count II also sought to pierce the corporate veil in order to hold HOV and Lason liable for breach of contract. On defendants' motion, the court dismissed PSC's breach of contract claim against Lason. *PSC Info Group v. Lason, Inc.*, No. 08-2176, 2008 WL 4660943, at *8 (E.D. Pa. Oct. 21, 2008). Defendants now move for summary judgment on the remaining claims.

## II. Standard of Review

A motion for summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this initial burden, the nonmoving party must "come forward with 'specific facts

showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting and adding emphasis to Fed. R. Civ. P. 56(e)). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996) (citation and internal quotation marks omitted). The non-movant must present concrete evidence supporting each essential element of its claim. *Celotex*, 477 U.S. at 322-23.

In evaluating a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms*, 90 F.3d at 744 (citation and internal quotation marks omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990). The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

## III. Discussion

Defendants move for summary judgment on all of PSC's remaining claims. I conclude that PSC's breach of contract claims against BACS are time-barred to the extent that they reflect breaches that occurred over six months before PSC filed this action. To the extent that BACS

may have breached the contract by using other vendors after November 10, 2007, however, PSC's claims for such breaches are not time-barred. I further conclude that PSC has waived its veil-piercing arguments against HOV. Finally, although there is a genuine issue of material fact as to whether HOV tortiously interfered in the contract between BACS and PSC, which a jury must resolve, there is no genuine issue of material fact from which a reasonable jury could find that Lason tortiously interfered with that contract. As a result, I will grant defendants' motion for summary judgment as to the breach of contract claim against HOV and the tortious interference claim against Lason. I will also grant in part defendants' motion for summary judgment as to the breach of contract claim against BACS and will deny the motion as to the tortious interference claim against HOV.

### A. Contractual Claims Against BACS

#### 1. Contractual Obligations

PSC alleges that BACS breached the agreement in two ways: (1) by failing to supply PSC with the contractually required volume of processing work, and (2) by failing to make PSC its "exclusive vendor" for document processing as required by the agreement. Defendants acknowledge that the agreement contained a requirement that BACS use PSC as its exclusive provider of mailing processing services. (Defs.' Mem. 3.) However, defendants argue that the contract did not include a minimum volume requirement. I agree. As a result, the only conduct that could constitute a breach is BACS' failure to make PSC its exclusive document processing vendor.

The contract between BACS and PSC contains the following relevant language:

I. SERVICES RENDERED - . . . *PSC will become Client's exclusive agent* for the purposes described herein. . . .

***

9

V. PRICING - DATAExpress™ Pricing shall be in accordance with the pricing matrix shown on Exhibit A.[11] The initial pricing level shall be predicated upon the future total units of monthly processing and mailing *which is projected initially to be 400,000 per month. Based upon the consistency of that volume*, all DATAExpress™ pricing will be protected from any additional increases for the initial term of this Agreement with the sole exception of any U.S. postal price increases, which client agrees to pay. *Should Client's monthly transaction volume fail to reach the projected volume*, upon which PSC pricing to Client has been established, within 120 days from the commencement of processing, *PSC reserves the right to adjust the per unit charge from that point forward*. The per unit charge shall revert, from that point forward, to the applicable volume based rate as set forth on Exhibit A. . . . .

The initial pricing structure for this Agreement will be established based on the following volume and pricing terms:

(A) Document type(s): collection letters, (b) Total Estimated Monthly Submission after three (3) months testing phase: 400,000, (c) Price Per Item: <u>See Pricing Matrix on Exhibit A.</u> (D) Initial implementation and setup fees: $ <u>none.</u>

(PSC Contract ¶¶ I, IV.) As is apparent from this language, the volume supplied by BACS was only "initially projected," not required, to be approximately 400,000. Although volume is clearly an important factor in the agreement, PSC's remedies if volume failed to reach 400,000 units are, by the terms of its own form contract, limited to altering the per-unit processing prices. PSC's interest in maintaining a high transaction volume is further protected by BACS' promise that PSC would become its "exclusive agent" for the purposes of the services described in the agreement.

PSC argues that, in a "Client Implementation Form" separate from the agreement itself, the "parties expressly agreed that [BACS] would provide 400,000 letters monthly." (Pl.'s Mem. 7.) However, like the agreement itself, that form only states that the "Est. Volume Per Cycle" would be 400,000 units per month. (Pl.'s Reply Ex. I, at 3.) Neither does the form purport to be a

---

[11] Exhibit A to the agreement contains a volume-based pricing schedule with differential rates for orders of less than 200,000 units, orders of between 200,001 and 300,000 units, orders of between 300,001 and 400,000 units, and orders of over 400,001 units.

new contract, or an amendment to the initial agreement, such that it could transform a "projected" volume into a required volume. Even if the Client Implementation Form did purport to create a new contractual obligation on the part of BACS, it could not have done so as the original agreement stipulated that it "may be modified only by an amendment executed in writing by authorized representatives of the parties herein." (PSC Contract ¶ XV.) The Client Implementation Form is not signed by either party and therefore cannot modify the terms of the original agreement.

PSC also argues that it is the "industry custom" to view projections of processing volume as creating an obligation on the client to provide work within a certain margin of the projected volume. (Pl.'s Mem. 7.) In his deposition, Greco testified that "[i]n our business when we put down a quantity expected, it is expected that within a small percentage, give or take 10 percent, that that is going to be the amount that we expect." (Greco Dep. 56; *see also id.* at 34 (stating that BACS was "required by [the] contract to provide [PSC] with 400,000 per month").) PSC has cited this portion of Greco's deposition testimony as support for its argument that "BACS was required to meet the 400,000 per month volume," subject to a 10% variation. (Pl.'s Resp. ¶ 11.) However, the agreement explicitly states that "[n]o course of dealing, usage of trade nor course of performance shall be relevant to explain or supplement any term expressed in this Agreement." (PSC Contract ¶ XV.) What is normally expected in the document processing business is therefore irrelevant to the question of whether BACS was required by the terms of its contract to supply 400,000 units per month for processing.

In Pennsylvania, "[i]f the court determines that a contract is clear, or unambiguous, then it construes the contract as a matter of law." *Allegheny Int'l v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir. 1994). "[W]hen the words are clear and unambiguous the intent is to be

discovered only from the express language of the agreement." *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982). The clear language of the contract here does not state any minimum volume requirement. Accordingly, to the extent PSC's breach of contract claim against BACS is based on the argument that BACS was required to meet a minimum volume, I will grant summary judgment in favor of BACS.

### 2. Applicable Limitations Period

BACS further argues that any breach of contract claims against it are time-barred as a result of a provision in its agreement with PSC that required the parties to bring any claim arising out of that agreement within six months of the time when the claim accrued. PSC argues that the six-month contractual limitations period does not apply to this action and that, in the alternative, the limitations period is "manifestly unreasonable" and therefore unenforceable. I conclude that the limitations period does apply to this action as a matter of law and is enforceable. As a result, absent tolling, PSC may prevail only on those breaches of the contract that occurred on or after November 10, 2007, six months before PSC filed its complaint.

PSC argues that the six-month limitations period was intended to apply only to actions commenced by BACS against PSC, not to actions commenced by PSC against BACS. (Pl.'s Resp. ¶ 9.) The only support PSC provides for this argument is that the six-month limitation does not apply to this case "because of [the limitation's] wording" and that "PSC's interpretation is logical, BACS' is not." (*Id.*) To the contrary, the plain language of the contract contradicts PSC's contention. According to that language,

> XII. APPLICABLE LAW - * * * The parties hereto consent to the exclusive
> jurisdiction of the courts of Montgomery County, Pennsylvania. *Any claim* arising
> out of or related to this Agreement must be brought no later than six months after
> it has accrued.

(PSC Contract ¶ XII  (emphasis added).) PSC has not identified any case suggesting that the words "any claim," used in this context, mean something other than "any claim."[12] *Cf. Steuart*, 444 A.2d at 661 ("[W]hen the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement.")

PSC's assertion that the limitations period applied only to claims brought by BACS is further undermined by language in the agreement governing its interpretation. The agreement states, for example, that "[n]o course of dealing, usage or trade nor course of performance shall be relevant to explain or supplement any term expressed in this Agreement." (*Id.* ¶ XV.) Thus, even if PSC were to provide evidence that similar language is normally used to create a limitations period only on a client's claims against the service provider—and it has not provided any—such evidence would not have any bearing on the terms of the agreement. Finally, although the court does not detect any ambiguity in the wording of the limitation provision, "it is well

---

[12] Another provision of the agreement, titled "Arbitration," stipulates that:

> [a]ny and all disputes arising out of or in connection with the subject matter of this Agreement shall be submitted to arbitration in Montgomery County, Pennsylvania under the then current rules of the American Arbitration Association and the decision of the arbitrators shall be final. Any claim arising out of or related to this Agreement shall be brought no later than 6 months after it has accrued. *This arbitration provision shall not apply to collection actions for fees and costs owed to PSC for work performed*, which shall be in the jurisdiction of the Montgomery County or Philadelphia County Court of Common Pleas, or the United States District Court - E.D. Pa. Only.

(PSC Contract ¶ XIII (emphasis added).) This limiting language applies only to the arbitration provision, not to the six-month period of limitations set forth in section XII of the agreement. PSC easily could have inserted similar limiting language in section XII if it had wished to carve out an exception for itself, but it did not. Even if it had included identical limiting language in section XII, that language would not apply to all of the claims that PSC asserts in this matter, which include contractual damages above and beyond merely fees and costs for work already performed. Because neither party has moved to compel arbitration in this case, the provisions set forth in section XIII are not relevant to this matter.

settled that a written agreement will be construed against the party preparing it." *Cent. Transp. v. Bd. of Assessment Appeals*, 417 A.2d 144, 149 (Pa. 1980).[13] PSC supplied the form language for this agreement. (Greco Dep. 20.) PSC's argument that it should not be held to the clear meaning of its own contractual language is therefore meritless.

PSC also argues that, even if the six-month limitations period applies to claims brought by it against BACS, the six-month limitations period is unreasonably short under the circumstances. I disagree.

Pennsylvania law generally provides a four-year limitations period on breach of contract actions. 42 Pa. Cons. Stat. Ann. § 5525(a)(8). The parties may shorten that limitations period by written agreement, provided that the shorter period is "not manifestly unreasonable." *Id.* § 5501(a).

There is little Pennsylvania case law addressing how long a limitations period in a contract must be in order to be "not manifestly unreasonable." PSC relies on *Grosso v. Federal Express Corp.*, 467 F. Supp. 2d 449, 456 (E.D. Pa. 2006), a Family and Medical Leave Act ("FMLA") case in which the court declined to enforce a provision in an employment agreement requiring that an employee pursue any claim against the employer within six months of the claim's accrual. However, *Grosso*'s interpretation of Pennsylvania law was largely influenced by the court's conclusion that the six-month limitations period interfered with the employee's federal rights under the FMLA. *See id.* at 457 (distinguishing a case that had upheld a shortened period of limitations as "inapposite to this case, where the right at issue is not contractual, but rather is a federal statutory right"). No such issue is presented here, and courts have subsequently

---

[13] The contract stipulates that the law of Pennsylvania will govern its interpretation. PSC Contract ¶ XII.

limited the holding in *Grosso* to the FMLA context. *See Cole v. Federal Express Corp*., No. 06-3485, 2008 WL 4307090, at *8 (E.D. Pa. Sept. 19, 2008) (concluding that "there is no reason to find that the holding [in *Grosso*] extends to state causes of action").

Aside from *Grosso*, the only Pennsylvania cases that I or the parties have located addressing a contractually established limitations period as short as the one are *Holtby v. Zane*, 220 Pa. 178, 180 (1908), and *Brady v. Prudential Ins. Co.*, 168 Pa. 645, 649 (1895). In both of those cases the Pennsylvania Supreme Court upheld a contractual six-month limitations period. PSC suggests that the decisions are too old to constitute good law.[14] (Pl.'s Mem. 20.) However, they appear to be settled Pennsylvania law as neither case has been overruled and, with the exception of *Grosso*, PSC has not identified, nor can I locate, any recent cases arriving at a different conclusion.[15]

Nor am I able to locate any case in which a party prevailed in arguing that a limitations period in a contract *that it had itself drafted* was "manifestly unreasonable." Unlike the plaintiffs

---

[14] PSC further argues that *Brady* is distinguishable in that it involved an insurance claim, a situation in which the "loss is almost always readily cognizable," whereas the breach of contract at issue here involved "several different factors, many of which were not readily apparent to PSC." (Pl.'s Mem. 20.) This argument, however, goes to the question of whether the discovery rule should toll the limitations period in this case, not whether the period is itself reasonable.

[15] The fact that various state and federal causes of action are similarly subject to six-month limitations periods further supports my conclusion that such periods are not unreasonably short. *See, e.g.*, 42 Pa. Cons. Stat. Ann. § 5522 (requiring that, as a prerequisite to suit against a government unit, notice of the claim be provided to that unit within six months of the time the cause of action accrued); *Saranac Land & Timber Co. v. Comptroller of N.Y.*, 177 U.S. 318, 324 (1900) (noting that a federal six-month statute of limitations on certain actions in replevin offered the plaintiff a "reasonable opportunity to enforce his rights"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(e) (2006) (requiring that charges of discrimination be filed within 180 days of the allegedly unlawful practice); National Labor Relations Act, 29 U.S.C. § 160 (requiring complainants to file charges of unfair labor practices with the National Labor Relations Board within six months of the allegedly unfair practices).

in *Holtby*, *Brady*, or *Grosso*, PSC is not seeking to evade a limitations term in a contract drafted by another party, but instead is attempting to evade enforcement of language in its own standard form contract.

According to the clear language of the contract between PSC and BACS, all claims arising under the contract, including the ones at issue here, are subject to a six-month limitations period. According to the Pennsylvania Supreme Court, contractual limitations periods of six months are not manifestly unreasonable and are therefore enforceable against the parties to the contract. I therefore conclude as a matter of law, as is appropriate where the terms of a contract are unambiguous, that the applicable limitations period for PSC's breach of contract claims against BACS was six months. PSC filed its complaint on May 10, 2008. Absent tolling, PSC may prevail only on those breaches of contract that accrued on or after November 10, 2007.

### 3. Accrual of Claim

BACS argues that all of PSC's viable claims for breach of contract accrued before November 10, 2007, and are therefore untimely. (Defs.' Mem. 3-4.) In contrast, PSC argues that BACS' use of other vendors constituted a continuing violation that only ended on May 31, 2008, the date on which the contract was due to expire. (Pl.'s Mem. 19.) PSC also argues that the contractual limitations period should be construed as beginning to run only after the termination of the contract. (*Id.* at 17-18.) Finally, PSC argues that the discovery rule tolled the six-month limitations period until PSC acquired actual knowledge that HOV had acquired Lason and that BACS had been sending work to other companies.[16] I conclude that each use of a different vendor constituted a separate breach of the contract, each one with its own six-month limitations period. As a result, absent tolling, PSC cannot recover for breaches of the exclusivity agreement

---

[16] I address the discovery rule argument *infra* Part II.A.4.

that occurred prior to November 10, 2007. However, PSC's claims for breaches occurring after November 10, 2007, are not time-barred.

"In Pennsylvania, a cause of action accrues when the plaintiff could have first maintained the action to a successful conclusion." *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005). "Generally, an action founded on a contract accrues when the contract is breached." *Sadtler v. Jackson-Cross Co.*, 587 A.2d 727, 731 (Pa. Super. Ct. 1991). "Where the repeated and measurable invasion of a plaintiff's rights occurs both outside the statutory period and also within it, the fact that some of the injury and damage occurred outside the statutory period does not affect the plaintiff's right to recover for the separate invasion of its rights which occurred within the period." *Pa. Turnpike Com. v. Atlantic Richfield Co.*, 375 A.2d 890, 892 (Pa. Commw. Ct. 1977) (internal quotation and alteration omitted); *see also Verneau v. Vic's Market, Inc.*, 896 F.2d 43, 47 (3d Cir. 1990) (holding that each month that a store owner maintained excessive number of "baggers" on the payroll constituted a separate breach of the union contract); 4 Arthur Linton Corbin, *Corbin on Contracts* § 989 (1951). Conversely, the fact that some of the injury occurred within the limitations period does not revive the plaintiff's right to recover for breaches occurring prior to the cut-off date. *See Pa. Turnpike Com.*, 375 A.2d at 892 (granting summary judgment to defendants as to those causes of action that accrued outside the limitations period).

An exception exists where "services are rendered under an agreement which does not fix any certain time for payment or for the termination of the services." *Thorpe v. Schoenbrun*, 195 A.2d 870, 872 (Pa. Super. Ct. 1963) (internal quotation omitted). In such a case, "the contract will be treated as continuous, and the statute of limitations does not begin to run until the termination of the contractual relationship between the parties." *Id.* This doctrine, however, does

not apply to this matter. The contract between PSC and BACS contains specific provisions addressing the time for payment and setting a termination date. (PSC Contract ¶¶ IV, VI.)

Nor is there any basis to construe the contractual limitations period as beginning only after the termination of the contract. The contract states that the limitations period begins as soon as a claim "accrue[s]." (PSC Contract ¶ XII.) Pennsylvania recognizes that a claim for breach of contract accrues at the time of the breach, even if the contract remains in effect after the breach. *See Verneau*, 896 F.2d at 47.

As a result, each time that BACS sent work to a vendor other than PSC prior to the termination of the contract constituted a separate potential breach, each with its own separate limitations period.[17] Absent tolling, those breaches that occurred prior to November 10, 2007, are therefore time barred. On the other hand, defendants acknowledge that BACS sent processing work to Lason after November 10, 2007. (*See* Defs.' Mot. Ex. N.) Nor do defendants argue that the contract was terminated before November 10, 2007. (*See* Defs.' Mem. 3-8.) I will therefore deny defendants' motion for summary judgment as to those claims that accrued between November 10, 2007—six months prior to the filing of the complaint—and the end date of the contract, May 31, 2008.

### 4. Tolling

PSC argues that the limitations period should be tolled for those claims that accrued prior to November 10, 2007. First, PSC argues that the discovery rule should toll the limitations period, (1) until BACS sent written notice of its intent to terminate the contract, (2) until PSC became certain that BACS had been using other vendors, or (3) until PSC learned the cause for

---

[17] The parties disagree as to whether PSC committed a prior breach that relieved BACS of its ongoing duty to honor the exclusivity provision, in which case its use of other vendors would not constitute a breach. (*Compare* Defs.' Statement ¶¶ 19-23 *with* Pl.'s Resp. ¶¶ 4-5, 10.)

BACS' transition to another vendor, *i.e.* HOV's acquisition of Lason. (Pl.'s Mem. 15-17.) PSC also argues that the limitations period should not begin until the contract was terminated or should include a grace period, allowing PSC to attempt to resolve its differences with BACS—at that point a current client—prior to filing suit. (*Id.* at 17-19.) However, any tolling to which PSC may be entitled would be insufficient to rescue any of its claims that accrued prior to November 10, 2007.

In *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1386 (3d Cir. 1994), the Third Circuit stated that the Pennsylvania discovery rule tolls the limitations period "until the plaintiff has discovered or, by exercising reasonable diligence, should have discovered (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct." "[O]ne claiming the benefit of the [discovery] exception bears the burden of establishing that she falls within it." *Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995).

PSC claims that it was not aware that BACS had breached the exclusivity portions of the agreement until February 2008, at which time PSC learned that HOV had acquired Lason, PSC's competitor. (Pl.'s Mem. 17.) PSC argues that BACS' mere failure to send work was insufficient to place PSC on notice that BACS had violated the exclusivity provisions because BACS could have done so "for any number of reasons, several of which would not be actionable." (*Id.*) However, PSC, which had the burden of showing its entitlement to the discovery rule, has offered no evidence that it was unaware of BACS' breach of the exclusivity provisions of the agreement until it learned of the Lason acquisition. To the contrary, Greco, the CEO of PSC, admitted in his deposition to a discussion with Singh in the Spring of 2007 in which Greco asked Singh why PSC had not become BACS' exclusive provider and in which Singh discussed issues that created a "challenge for [BACS] to convert . . . *from the other vendors* to [PSC]." (Greco

Dep. 39 (emphasis added).)[18] All orders to PSC stopped by July 2007. By September 5, 2007,

high-level officers of PSC were already considering legal action against BACS. At that point,

BACS had not sent any processing work to PSC for over two months, which was far longer than

the usual time between orders. (*See* Defs.' Mot. Ex. O.) Nor had BACS responded to any of

PSC's recent attempts at communication. (*See id.*)

PSC further suggests that the discovery rule should toll the limitations period until it

learned why BACS violated the exclusivity provision. The law is clear, however, that the

discovery rule tolls the statute of limitations only until the plaintiff learns, or by exercising

reasonable diligence should have learned, that its injury is caused by another person's wrongful

conduct, not until the plaintiff learns of the reasons behind the defendant's conduct. In *Fine v.

Checcio*, for example, which PSC cites, the Pennsylvania Supreme Court acknowledged that

dental malpractice plaintiffs were entitled to tolling of the discovery rule until they learned that

their facial numbness was permanent and not merely a temporary and expected side effect of

surgery. 870 A.2d at 861-62. The relevant knowledge in *Fine* was whether their symptoms were

a "manifestation of injury," not the reasons for the defendant's wrongful conduct. *Id.* As noted

above, it is undisputed that PSC knew as early as May 2007 that BACS was violating the

---

[18] Even if PSC had lacked actual knowledge of BACS' breach of the exclusivity
provision, lack of actual knowledge is insufficient to trigger the application of the discovery rule.
*See Fine*, 870 A.2d at 858. Once a party has reason to suspect that an injury is caused by the
wrongful conduct of another, the party has an obligation to exercise diligence in discovering the
facts underlying his or her claim. *Id.* PSC officials clearly suspected by September 5, 2007, that
BACS had transferred its business to other vendors. (*See* Defs.' Mot. Ex. O.) Yet PSC has not
presented any evidence that it acted on this suspicion before February 15, 2008, when its attorney
informed BACS that it was in default of its contractual obligations. (*See* Pl.'s Reply Ex. G.) PSC
has also failed to provide any explanation for its failure to discover the Lason acquisition until
February 2008, despite the fact that the acquisition had been announced in an industry press
release dated "on or around March 01, 2007." (*See* Pl.'s Reply Ex. M (Feb. 25, 2008, email from
Marie Gunning to David Shulick.)

exclusivity provisions of the contract, even if PSC did not know until February 2008 that these violations were due to HOV's acquisition of Lason. It is also undisputed that, by September 2007, PSC was aware that BACS' conduct had caused economic injury to PSC.

An earlier Pennsylvania Supreme Court case, *Crouse v. Cyclops Industries*, 745 A.2d 606 (Pa. 2000), reinforces this interpretation of *Fine*. In *Crouse*, the plaintiff, who had relied on the defendant's promise to provide the plaintiff with steel-forging business, sued the defendant on a theory of promissory estoppel. The court held that, when the defendant failed to provide the amount of business promised but assured the plaintiff that it planned to send more business in the future, the discovery rule tolled the statute of limitations on plaintiff's claims until it became clear that the defendant did not intend to fulfill its promise. *Id.* at 612.[19] Notably, however, the court did not hold that the plaintiff was entitled to tolling until he learned *why* the defendant decided not to send more steel-forging work to the plaintiff and the opinion itself fails to identify any reason for the defendant's conduct. The limitations period is therefore tolled, if at all, only until PSC reasonably should have known that BACS had breached, and was continuing to breach, the exclusivity agreement by sending work to some other vendor, not until PSC knew the identity of that other vendor. Moreover, unlike the defendant in *Crouse*, there is no evidence that BACS made any assurance after June 2007 that it would use PSC's services exclusively on or after June 2007 and that it would resume sending business to PSC. (*See* Defs.' Mot. Ex. O.)

Finally, assuming, without deciding, that PSC was entitled to a reasonable grace period during which to attempt to mend its relationship with BACS, there is no evidence in the record

---

[19] Although *Crouse* involved a claim for promissory estoppel and not breach of contract, the court's discussion of the discovery rule was not specific to the promissory estoppel context. *See Crouse*, 745 A.2d at 611. As with breach of contract claims, the court in *Crouse* analyzed the discovery rule in terms of when Crouse "knew or should have known" that the defendant's promises were not being kept. *See id.* at 612.

that PSC actually made any such attempt after September 5, 2007, well over six months before it filed this action. Nor has PSC suggested that it had any reason to believe, as of September 2007, that BACS would eventually cure its breach on its own. Unlike the plaintiff in *Crouse*, who forewent legal action for a period of time as a result of the defendant's "commitment letter anticipating an irregular flow" of work, *see* 745 A.2d at 612, BACS had no prior history of going more than a month without sending any work. (*See* Defs.' Mot. Exs. O, P.) When a party seeks an exception to the general rule that "the statute of limitations begins to run as soon as the right to institute and maintain a suit arises," that party bears the burden of showing that an exception to that general rule applies. *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983).

When dealing with the discovery rule, "only where the facts are so clear that reasonable minds *cannot differ* may the commencement of the limitations period be determined as a matter of law." *Crouse*, 745 A.2d at 611. The testimony of PSC's management establishes that there is no genuine issue of material fact as to their awareness of BACS' use of *some* other vendor or vendors nearly a full year before the complaint was filed. PSC knew that it was injured no later than July 2007, when BACS stopped sending any collection letters at all, and certainly knew that BACS was the entity that had harmed it.[20] I conclude that PSC's argument that the limitations period did not begin until PSC could have with reasonable diligence discovered the *cause* of its injury is incorrect. PSC did not need to know what was going on "inside the walls of BACS." (*See* Pl.'s Mem. 16.) It only needed to know that it was injured.

---

[20] Although PSC may not have learned until later that HOV and Lason contributed to its injury, PSC's breach of contract claims are against BACS. As a result, it matters only whether PSC was aware of BACS' wrongful conduct.

I therefore conclude that, even were PSC entitled to some tolling of the six-month limitations period, any applicable tolling period would have ended at by September 2007, at the latest. Any claims to which tolling applied would therefore by time barred in March 2008, six months later. As a result, PSC may pursue only those claims for breach of contract that actually accrued within six months of the date on which it filed this action, *i.e.* by November 10, 2007.

### 5. Contract Defenses

Defendants also allege that PSC breached the contract at various times, forcing BACS to use other vendors and "eroding BACS' confidence in PSC's operations." (Defs.' Mem. 1-3; *see also* Defs.' Statement ¶¶ 19-23.) Defendants allege that PSC "failed to supply adequate samples and configure its equipment to BACS' data until September, 2006, which meant PSC [sic] had to continue to use other suppliers between May and September." (Defs.' Mem. 1.) Defendants further allege that PSC repeatedly overcharged BACS and that PSC "imposed a price increase to which it was not entitled, thereby breaching the Agreement." (*Id.*) In contrast, PSC alleges that BACS' stated justifications for its breach are "pre-textual and false." (Pl.'s Resp. ¶¶ 4-5.) PSC further notes that BACS failed to send PSC written notice of any alleged breach, nor did it attempt to terminate the contract "for cause" according to the procedure outlined in the contract. (Pl.'s Resp. ¶ 10.)[21] Defendants have not provided any evidence that they provided any such notice. Moreover, PSC's alleged breaches occurred in fall 2006 (*see* Defs.' Statement ¶¶ 18-23), but BACS did not fully transition to using another vendor until July 2007. PSC's only timely claims relate to BACS' use of other vendors after that point. As a result, there exist genuine

---

[21] The relevant provision of the contract states that the contract may be terminated for cause in the event of a "material breach," if the non-breaching party provides written notification of the alleged breach and provides the breaching party with 30 days within which to cure the breach. (*See* PSC Contract ¶ IV(c).)

issues of material fact from which a reasonable juror could find that BACS' use of other vendors was not justified by any prior breach by PSC. Such issues are for the jury to decide.

**B. Veil-Piercing Claims Against HOV**

PSC's initial complaint also sought to hold HOV liable for breach of contract, arguing that HOV used BACS as its "alter ego." (Pl.'s Compl. ¶ 29.) Defendants have moved for summary judgment on this claim, arguing that no reasonable juror could consider BACS the "alter ego" of HOV. (Defs.' Mem. 9-11.) PSC has not objected to this aspect of defendants' motion and has identified no evidence from which a reasonable juror could find that BACS was an alter ego of HOV.[22] I will therefore grant summary judgment in favor of HOV as to PSC's breach of contract claims.

**C. Tortious Interference Claims**

Defendants also seek summary judgment on PSC's tortious interference claims against HOV and Lason. Defendants argue that, to the extent that HOV interfered with the agreement between BACS and PSC, that interference was privileged because it was motivated by HOV's interest, as BACS' parent, in BACS' profitability. Defendants also argue that Lason did not tortiously interfere with the agreement because it was "unaware of the Agreement prior to its being acquired by HOV" and because its motivations were, like HOV's, privileged. PSC responds that HOV acted not to prevent dissipation or waste of its subsidiary's assets but to

---

[22] PSC does briefly suggest in its opposition that HOV and Lason failed to "properly obey[] the concept of separate and distinct corporate entities" with regard to BACS, but this argument appears to be related to PSC's tortious interference claims, not its breach of contract claim. (Pl.'s Mem. 23.) Moreover, PSC fails to identify any evidence relevant to its veil-piercing claim, stating only that "[d]iscovery will reveal that HOV and Lason disregarded the corporate form and controlled [BACS] in such a way that they were able to coerce [BACS] to breach its contract with PSC," as if this were a response to a motion to dismiss. (*Id.*) Discovery has long since concluded.

aggrandize itself and to benefit Lason. I conclude that there is a genuine issue of material fact as to whether HOV's interference with the contract was privileged and will deny defendants' claim for summary judgment as to the tortious interference claim against HOV. However, because PSC has not produced any evidence that Lason intentionally interfered with the contract, I will grant defendants' motion for summary judgment as to the tortious interference claim against Lason.[23]

### 1. Legal Standard

In Pennsylvania, a tortious interference claim requires proof of the following elements: (1) an existing or prospective contractual relation between the complainant and a third party; (2) purposeful action intended to harm an existing contractual relation or to prevent a prospective one; (3) absence of privilege or justification; and (4) legal damage. *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 357 F.3d 375, 384 (3d Cir. 2004). The plaintiff bears the burden of proving each element, including the absence of privilege. *Bahelda v. Hankinson Corp.*, 323 A.2d 121, 122-23 (Pa. Super. 1974).

"Unlike other intentional torts such as intentional injury to person or property, or defamation," there is no "crystallized set of definite rules as to the existence or nonexistence of a privilege" to interfere with contracts. Restatement (Second) of Torts § 767 cmt. b (1979). As a result, the Restatement analyzes the issue of privilege or justification in terms of whether the defendant's act was "improper . . . rather than in terms of whether there was a specific privilege to act in the manner specified." *Id.* The following factors are relevant to whether interference is improper:

---

[23] PSC argues that, because HOV and Lason are not parties to the contract between PSC and BACS, the tortious interference claims are not subject to the six-month limitations period established in that contract. (*See* Pl.'s Mem. 20.) Defendants have not argued otherwise. (*See* Defs.' Mem. 11-15.)

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*Id.* § 767; *see also Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1184 (Pa. 1978) (following section 767 of the Restatement). Overall, the "central inquiry" is whether the defendant's interference is "'sanctioned' by the 'rules of the game' which society has adopted [defining] socially acceptable conduct which the law regards [as] privileged.'" *See Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 673 (3d Cir. 1991) (first alteration in original) (quoting *Glenn v. Point Park Coll.*, 272 A.2d 895, 899 (Pa. 1971)). The court must evaluate the issue of propriety "for the precise facts of the case before the court; and, as in the determination of whether conduct is negligent, [the outcome] is usually not controlling in another factual situation." Restatement (Second) of Torts § 767 cmt. b.

"On the other hand, factual patterns develop and judicial decisions regarding them also develop patterns for holdings that begin to evolve crystallized privileges or rules defining conduct that is not improper." *Id.* The Restatement has therefore also outlined "the results of the balancing process in some specific situations that have been the subject of judicial decision." *Id.*; *see id.* §§ 768-774. These sections, however, "do not constitute an exhaustive list of situations in which it has been determined that an intentional interference with contractual relations is not improper." *Id.* § 767 cmt. b.

## 2. HOV

Defendants argue that, as BACS' corporate parent, HOV was privileged to direct BACS to end its relationship with PSC and transfer its mailing work to Lason in order to "contribute to

increased productivity by the entire family of companies." (Defs.' Mem. 13.)[24] PSC argues that no corporate parent privilege applies to HOV because: (1) BACS was owned by HOV, Ltd.'s subsidiary, HOV, LLC, and not directly by HOV, Ltd. (*see* Pl.'s Mem. 3); (2) HOV's decision to terminate the PSC contract was motivated by an interest in "aggrandiz[ing]" its own business rather than by an interest in avoiding waste of BACS' assets (*see id.* at 9); and (3) the contract with which HOV interfered had already been executed (*see id.* at 11).[25] Because reasonable minds could disagree as to whether HOV's actions were "sanctioned" by the "rules of the game" in light of all circumstances, I will deny defendants' motion for summary judgment as to this claim.

Those cases that have acknowledged a corporate parent privilege under Pennsylvania law have done so only in the context of a prospective contract or a contract terminable at will. *See Green v. Interstate United Mgmt. Servs. Corp.*, 748 F.2d 827, 831 (3d Cir. 1984) (holding that a corporate parent is privileged to interfere in the prospective contractual relationships of its wholly-owned subsidiary in order to avoid dissipation of the subsidiary's assets); *Advent Sys. Ltd.*, 925 F.2d at 673 (holding that a corporate parent was privileged to prevent its subsidiary from entering into a contract with a competitor of the parent); *Nat'l Data Payment Sys. v. Meridian Bank*, 212 F.3d 849, 857-58 (3d Cir. 2000) (citing Restatement (Second) of Torts § 768, which applies by its terms only to contracts terminable at will, and holding that a

---

[24] The other elements of the tortious interference claim—that is, the existence of a contract between PSC and BACS, purposeful interference by HOV to harm that contract, and the existence of legal damages on the part of PSC—are undisputed.

[25] PSC also makes much of the fact that BACS and Lason have different corporate parents. (*See* Pl.'s Mem. 10-11.) PSC does not explain, however, how that fact would affect HOV's privilege to interfere in BACS' contractual relations. In any event, on the record submitted to date, there are disputed issues of fact as to the corporate structure.

prospective corporate parent was privileged to instruct its subsidiary to terminate a contract with a competitor of the parent). To the extent that the Restatement itself codifies a corporate parent privilege, that codification also applies only to prospective contractual relations and not to existing ones. *See* Restatement (Second) Torts § 769 (stating that one who has a "financial interest in the business of a third person" is privileged, under certain circumstances, to interfere in the prospective contractual relations of the third person); *id.* cmt. b (clarifying that this section does not apply to breach of an existing contract).[26] The Restatement acknowledges, however, that, even when interference is not specifically privileged according to section 769, it may nevertheless be proper under the general principles set forth in section 767. *Id.* cmt. b.

In an existing contract not terminable at will, the "social interests in protecting the freedom of the actor" may be outweighed by the "contractual interests of the other," *see id.* § 767(e), even when the actor is the corporate parent of the third party. Thus, in *Shared Communications v. Bell Atlantic*, the Pennsylvania Superior Court held that a parent corporation was not privileged to instruct its subsidiary to breach an existing contract with a third party in order to give more business to a corporate "sibling" where doing so was not in the first subsidiary's financial interest. 692 A.2d 570, 575 (Pa. Super. Ct. 1997).[27] This case, however, is

---

[26] Although PSC argues that the corporate parent privilege does not apply to the actions of corporate "grandparents" (*see* Pl.'s Mem. 3), it has not identified any case that has made such a distinction. Those authorities that have recognized a privilege on the part of corporate parents to interfere in the contractual relations of their subsidiaries have focused on the parents' interest in avoiding the "dissipation" of their subsidiaries' assets (*see Green*, 748 F.2d at 831; Restatement (Second) of Torts § 769), an interest that corporate grandparents share, if indirectly. *Cf. Williams v. B & K Med. Sys.*, 732 N.E.2d 300, 309-10 (Mass. App. Ct. 2000) (holding that, to invoke corporate parent or grandparent privilege, defendant must show that it has a direct financial interest in the contract with which it interfered). It is therefore irrelevant, for the purposes of privilege, whether BACS is owned by HOV, Ltd. or by HOV, Ltd.'s subsidiary, HOV, LLC.

[27] The Pennsylvania Supreme Court has yet neither adopted nor rejected the reasoning in *Shared Communications. See Nat'l Data Payment Sys.*, 212 F.3d at 857. As a result, as

distinguishable from the matter before me in that PSC has not identified any evidence that BACS' breach of the contract was against BACS' own financial interests. PSC had the burden to produce evidence on the absence of privilege. *See Bahelda*, 323 A.2d at 122-23. No reasonable juror could conclude, on the basis of the evidence (or lack thereof) before me, therefore, that HOV acted with an improper purpose of enriching itself or another subsidiary at BACS' expense, as the defendant did in *Shared Communications*. Thus, although HOV's conduct is distinguishable from the type of corporate parent conduct that previous cases have considered privileged, it is also distinguishable from the type of conduct that has been previously recognized as improper.

Application of the Restatement's standard is similarly inconclusive, as different factors favor each party. On the one hand, the "nature of [HOV's] conduct," and the interests HOV sought to advance, were proper. *See* Restatement (Second) of Torts § 767(a), (d). HOV did not use such typically wrongful means as fraud or violence,[28] *see id.* cmt. c, and HOV had a legitimate economic interest in BACS' activities, *see id.* cmts. f, I. On the other hand, HOV intentionally and directly interfered with an existing contract with another. *See id.* § 767(b), (f), cmts. d, h.

---

defendants point out, the decision in *Shared Communications* is entitled to "'proper regard' . . . but not conclusive effect." *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 662 (3rd Cir. 1980). Nevertheless, I accord it significant persuasive weight because it is not inconsistent with the decisions of the Pennsylvania Supreme Court and because its reasoning is consistent with that of the Restatement, which I discuss in more detail *infra*.

[28] PSC's allegations that HOV failed to include PSC in its decisionmaking process and "coerce[d]" BACS into breaching the contract (*see* Pl.'s Mem. 11-12, 23) may be viewed as accusations of using "wrongful means." However, PSC has not identified any evidence that HOV employed coercive means in directing BACS to breach the contract. Although a mere failure to communicate with PSC falls short of the degree of wrongfulness of other activities that the Restatement lists by way of example, such as fraud, violence, and misrepresentation (*see* Restatement (Second) Torts § 767 cmt. c), the Restatement acknowledges that "[v]iolation of recognized ethical codes for a particular area of business activity or of established customs or practices regarding disapproved actions or methods may also be significant" in assessing whether the defendant's interference was wrongful (*see id.*).

Moreover, PSC had an existing contract with BACS for a specific length of time, which entitled PSC to a "stronger claim to security" than it would have had if the contract had been merely prospective or at will. *See id.* cmt. e. PSC's interest in the security of its existing contract was therefore quite strong. *See id.* §767 (c), (e). An interest that "has been already consolidated into the binding legal obligation of a contract . . . will normally outweigh the actor's own [economic] interest in taking that established right from him." *Id.* cmt. f.[29]

Where "no recognized privilege has been formulated" and there is "room for different views, the determination of whether the interference was proper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question." *Id.* cmt. *l.* I therefore conclude that summary judgment is not appropriate for PSC's tortious interference claim against HOV and will deny defendants' motion as to that claim. Indeed, it would seem likely that a jury will find an absence of privilege under these facts and circumstances.

### 3. Lason

PSC's tortious interference claim against Lason, however, fails as a matter of law. As noted above, intent is an essential element of a tortious interference claim. *CGB Occupational Therapy*, 357 F.3d at 384; Restatement (Second) of Torts § 767 cmt. d ("Since interference with contractual relations is an intentional tort . . . the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct."). PSC has not identified any evidence showing that Lason was aware of the contract between BACS and PSC until after BACS transferred its business to Lason.

---

[29] On the other hand, if the jury believes that PSC had already breached its contract with BACS before BACS transferred its business to Lason—a fact that is contested—PSC's interest in the security of the contract may be diminished.

I will therefore grant defendants' motion for summary judgment on PSC's tortious interference claims against Lason.

## IV. Conclusion

PSC's breach of contract claims against BACS are untimely under the terms of the contract at issue insofar as they refer to breaches prior to November 10, 2007. I will therefore grant summary judgment to BACS as to that portion of PSC's breach of contract claims. I will also grant summary judgment in BACS' favor on PSC's breach of contract claims to the extent that those claims are based on a minimum volume requirement, as no such requirement exists in the contract as a matter of law. PSC's claims against BACS for breach of the exclusivity provision after November 10, 2007, are, however, potentially valid and timely. Regardless, PSC has abandoned its breach of contract claim against HOV by failing to produce evidence to support its veil-piercing argument. I will therefore grant summary judgment as to PSC's breach of contract claim against HOV.

I will also grant summary judgment to defendants as to PSC's tortious interference claim against Lason because PSC has failed to produce any evidence from which a reasonable juror could find that Lason was aware of BACS' exclusive contract with PSC. I will, however, deny summary judgment as to PSC's tortious interference claim against HOV because reasonable minds could differ as to whether HOV's interference with the contract was proper. An appropriate order accompanies this memorandum.